# Union Pacific Railroad Company, Petitioner, et al.,[1] *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 35639–35649, 35684, 35685, 40002, 40060–40062.
Promulgated October 7, 1932.

---

[1] Proceedings of the following petitioners are consolidated herewith: Oregon Short Line Railroad Company; The St. Joseph and Grand Island Railway Company; San Francisco and Portland Steamship Company, by Oregon-Washington Railroad & Navigation Company, Successor; Yakima Valley Transportation Company; The Union Pacific Coal Company; Washington Union Coal Company; Oregon and Washington Railroad Company; The Rattlesnake Creek Water Company; Union Pacific Water Company; Union Pacific Equipment Association; Green River Water Works Company; Portland Terminal Investment Company; Oregon-Washington Railroad & Navigation Company, as transferee of the San Francisco and Portland Steamship Company; Los Angeles & Salt Lake Railroad Company; and Des Chutes Railroad Company.

*Henry W. Clark, Esq.*, and *Harry J. Gerrity, Esq.*, for the petitioners.

*E. C. Algire, Esq.*, for the respondent.

**OPINION.**

ARUNDELL: These proceedings involve deficiencies in income taxes of the Union Pacific Railroad Company and its affiliated corporations for the years 1920 to 1923, inclusive, in an aggregate amount of $1,617,423. Docket No. 40002 is a transferee proceeding, which the parties agree is disposed of by their stipulation that any deficiency shall be allocated wholly to the parent, the Union Pacific Railroad Company. The transferee liability asserted by the respondent is in the amount of $3,220.25.

The petitions filed allege 25 errors, of which 14, and an affirmative defense presented by respondent, have been disposed of by confession, abandonment, or stipulation. The matters so disposed of are set forth in petitioner's brief and are agreed to by respondent in his brief. They are incorporated herein by reference and will be given effect under rule 50.

Most of the facts relating to the remaining 11 issues have been agreed upon through the medium of the respondent's acquiescence in the findings proposed by petitioners. We will set out the several issues to be decided, numbered and lettered as they appear in the pleadings and briefs, and under each one give only a summary of the facts sufficient for an understanding of the question presented.

ISSUE B.—*Inclusion in income of donations of property, money, or labor from industries and others.*—Petitioners received donations for the construction of transportation facilities which pursuant to the accounting methods prescribed by the Interstate Commerce Commission, it credited to an account designated "606—Donations." The amounts as credited were: 1920, $64,261.21; 1921, $59,370.68; 1922, $70,222.89; and 1923, $133,859.90. The respondent included these amounts in income, but now confesses error as to all except $788.30 for 1921; $5,150.28 for 1922; and $4,534.54 for 1923.

The amounts still in dispute arise out of instances where facilities were constructed pursuant to contract under which the industry desiring the facilities was required to deposit with the petitioners the estimated cost thereof, which deposit was to be refunded at a specified rate per carload shipped by the industry over the facilities within a designated period of time. In such cases the amounts deposited were credited by petitioners in the first instance to an account designated "770—Donations subject to complete or partial refund," and such account was charged with all refunds made under the contracts with the depositing industries. Upon the expiration of the contract time limit, any balance remaining in the "770" account was transferred to the "606" account. The amounts so transferred were forfeited by the donors and were no longer subject to refund. The amounts transferred in 1921, 1922, and 1923 are the items that respondent contends should be included in income.

In *Great Northern Ry. Co.*, 8 B. T. A. 225, we held that donations credited by the carrier to the "606—Donations" account did not constitute income and because of that decision respondent has conceded the major portion of the amounts originally in controversy here. We do not understand on what ground a valid distinction can be made between the amounts placed directly in the "606" account on receipt, and those placed in the "770" account in the first instance and later transferred. Both represent money or property contributed by outside interests for the construction of railroad facilities. The respondent argues that under the contracts the amounts deposited by the industries were not contributions to capital but were guaranties or earnest money to insure the performance of that part of the contracts which provided for the shipment of revenue freight. We do not understand the contracts to obligate the industries to ship any freight over the facilities for which they paid by making deposits with the carrier. The contracts merely provide that if and when shipments are made by the depositor the amounts deposited will be refunded on a carload basis. We think it safe to say that, in all cases where contributions are made to common carriers or public utilities for the construction of additional facilities, it is the in-

tention of all parties that the facilities will be used by the contributors. Whether the donations were income when placed in the "770" account is not before us to decide. When the contract period for refund expired and the donations became the absolute property of the carrier, we are clearly of the opinion that they assumed the same character as donations placed in the "606" account in the first instance and so fall within the *Great Northern* decision, *supra*. See also *Liberty Light & Power Co.*, 4 B. T. A. 155; *Texas & Pacific Ry. Co.*, 9 B. T. A. 365.

ISSUE D-1.—*Inclusion in 1920 income of payments received in settlement of the Government guaranty granted by section 209 of the Transportation Act, 1920.*—The railroads of petitioners Oregon Short Line Railroad Company and The St. Joseph and Grand Island Railway Company, and of their affiliate, the Oregon-Washington Railroad & Navigation Company, were under Federal control during the entire Federal control period ended February 29, 1920, and they duly accepted the guaranty extended by section 209 of the Transportation Act, 1920. In the final settlement with the petitioners under the guaranty provisions of the statute the Interstate Commerce Commission determined that the following amounts were payable to petitioners:

| | |
|---|---:|
| Oregon Short Line Railroad Co | $981, 624. 74 |
| St. Joseph & Grand Island Railway Co | 536, 867. 32 |
| Oregon-Washington R. R. & Navigation Co | 1, 665, 398. 15 |
| Total | 3, 183, 890. 21 |

These amounts were included by respondent in consolidated gross income for 1920, and they are reflected in consolidated tax liability as determined by the respondent for that year.

This issue, petitioners concede, has been decided adversely to their contentions in a number of cases. See *Gulf, Mobile & Northern R. R. Co.*, 22 B. T. A. 233, 247; *Chicago & North Western Ry. Co.*, 22 B. T. A. 1407, 1425. More recently the Supreme Court has decided the question the same way in *Texas & Pacific Ry. Co.* v. *United States*, 286 U. S. 285. Accordingly, on this issue we sustain the respondent.

ISSUE D-2.—*Whether respondent erred in not reducing the 1920 income received through the Government guaranty by the amount of the 2 per cent income tax adjustment allowed to the Oregon Short Line Railroad Company in the guaranty settlement.*—This issue is alternative to Issue D-1, and, inasmuch as we have held that the guaranty settlement constituted income, it becomes necessary to determine whether the amount thereof should be reduced by the 2 per cent tax.

As set forth above, the railroads of the Oregon Short Line Railroad Company were under Federal control during the entire Federal control period, and the company duly accepted the guaranty extended by section 209 of the Transportation Act, 1920.

In the final settlement with the company under the guaranty statute, the Interstate Commerce Commission determined that the amount of $981,624.74 was payable to the company by the United States. In determining the railway operating income of the company for the guaranty period for the purpose of determining the amount due to the company, the Interstate Commerce Commission allowed, pursuant to paragraph (f) (4) of the guaranty statute, the deduction of the sum of $54,965.20 as representing the 2 per cent tax upon the company's net income for the guaranty period.

Respondent has included the entire amount of the guaranty payment as taxable income of the company for 1920, without reduction or adjustment by the amount of $54,965.20, or any part thereof, either as constituting nontaxable income or as representing an allowable deduction.

Petitioners rely on the decision in *New York, Ontario & Western Ry. Co.*, 1 B. T. A. 1172, as supporting their claim that the amount of the guaranty settlement should be reduced by the amount of the 2 per cent tax in determining the portion of the settlement that constitutes taxable income. In the cited case and a number following it, we held that the 2 per cent tax imposed by the Revenue Act of 1916, and by virtue of section 230 (b) of the Revenue Act of 1918 a like percentage of the tax imposed by that act, which taxes were borne by the Director General of Railroads under the provisions of the Federal Control Act, did not constitute income to the railroads during the period of Federal control.

The present case likewise is governed by the Revenue Act of 1918; it is unlike the *New York, Ontario & Western* case, in that the income in dispute is not affected by the Federal Control Act of 1918, but has been determined by the Interstate Commerce Commission under the Transportation Act, 1920, for a period after the Federal Government relinquished control. Section 209 of the Transportation Act, 1920, in so far as applicable to a case like the one before us, guaranteed to the carrier an operating income for the six-month period following Federal control of not less than one-half of the annual compensation agreed upon by contract with the Director General. See *Texas & Pacific Ry. Co. v. United States*, 286 U. S. 285. Section 209 (f) (4) of the Transportation Act, 1920, refers indirectly to the 2 per cent tax by providing that the taxes under Titles I and II of the Revenue Act of 1917 and the taxes under the Revenue Act of 1918 that are treated as levied by an act in amendment of

those under the 1917 Act (sec sec. 230 (b) Revenue Act of 1918), are not to be included as expenses in computing railway operating income. The effect of this provision, as we construe it, is to allow the 2 per cent tax as a deduction in computing the operating income. The result of this, where the operating income is less than the guaranteed amount, is to increase the amount payable by the United States in fulfillment of the guaranty. In the present case it is agreed by the parties that for the purpose of ascertaining the amount due to the carrier under the guaranty, the Interstate Commerce Commission allowed, pursuant to paragraph (f) (4) of the guaranty statute, the deduction of $54,965.20 as representing the 2 per cent tax on the carrier's net income for the guaranty period. The amount of $54,-965.20 having been allowed as a deduction in computing operating income, the carrier was reimbursed for it in the settlement made under the guaranty statute. That amount then was included in the guaranty settlement which, as held under the preceding issue, constitutes income, and we know of no provision in the revenue act which would permit its exclusion. As above pointed out, the guaranty settlement was made pursuant to the Transportation Act, 1920, and not under the Federal Control Act of 1918, which we had for construction in the *New York, Ontario & Western* case, *supra*. While the Transportation Act, 1920, refers to the Federal Control Act for certain purposes, nothing has been called to our attention which would lead us to believe that there was any intent in enacting the guaranty statute to reduce, for tax purposes, the amount of a guaranty settlement for the period when the United States no longer had control of the railroads.

Issue D–3.—*Whether respondent erred in not allowing as an additional deduction for 1920 the amount of the 2 per cent income tax adjustment allowed to the Union Pacific Railroad Company in the guaranty settlement.*—The railroads of the Union Pacific Railroad Company were under Federal control during the entire Federal control period, and the company duly accepted the guaranty extended by section 209, Transportation Act, 1920. In the final settlement under the guaranty statute the Interstate Commerce Commission determined that the railway operating income of the company exceeded the amount guaranteed to it by the statute, and that there was due and payable by the company to the Government the sum of $1,946,399.14. In determining the railway operating income of the company for the guaranty period the Interstate Commerce Commission allowed, pursuant to paragraph (f) (4) of the guaranty statute, the deduction of $252,263.88 as representing the 2 per cent tax on the company's net income for the guaranty period.

The respondent has allowed as a deduction for 1920 the amount of $1,946,399.14 payable by the company to the Government, but has

not allowed any further deduction on account of the 2 per cent tax of $252,263.88, either as constituting nontaxable income or as representing an additional deduction.

The same arguments for and against the allowance of the 2 per cent tax advanced under the immediately preceding issue are made here. We think it is even more clear under this issue that the deduction claimed should not be allowed. The action of the Interstate Commerce Commission in allowing the 2 per cent tax as a deduction in computing operating income reduced by that much the sum that would otherwise have been payable to the United States. The claim made by the taxpayer amounts to one for the deduction of a Federal tax which, under the Revenue Act of 1918, is not allowable. We accordingly hold for the respondent on this issue.

Issue E.—*Whether respondent erred in holding that the liability of the Director General of Railroads for interest on completed additions and betterments is taxable as income of 1921, rather than of the Federal control years.*—Various properties of petitioners and their affiliates (a detailed list of which appears in petitioners' proposed findings and is agreed to by respondent) were taken over by the United States in 1917 and thereafter operated by the Director General of Railroads during the period of Federal control. In 1919 the Director General entered into contracts with the several companies affected, fixing the compensation to be paid for the use of the properties, and in section 7 (d) of each contract it was provided that:

Upon the cost of additions and betterments, less retirements in connection therewith, and upon the cost of road extensions, made to the property of the Companies during Federal control, the Director General shall, from the completion of the work, pay the Company a reasonable rate of interest, to be fixed by him on each occasion. In fixing such rate or rates he may take into account not merely the value of money but all pertinent facts and circumstances, whether the money used was derived from loans or otherwise, provided that to the extent that the money is advanced by the Director General or is obtained by the Companies from loans or from the proceeds of securities the rate or rates shall be the same as that charged by the Director General for loans to the Companies or to other companies of similar credit.

On March 4, 1920, the Director General announced, through a letter to the Association of Railway Executives, that under section 7 (d) of the " Standard Contract," " the rate of interest * * * is hereby fixed at four per cent per annum of the cost of additions and betterments to roadway and structures " and " the rate of interest on new equipment and on betterments to equipment is hereby fixed at six per cent per annum."

The rental interest due the companies concerned with this issue under section 7 (d) of the contract was determined and agreed upon

between the companies and the Director General in the final settlement of their Federal control accounts as the following amounts:

Union Pacific R. R. Co. and affiliates_____ $1, 771, 781. 96
Los Angeles & Salt Lake R. R. Co. (which became affiliated
  in 1921)_____ 145, 293. 18
                                                              _____
    Total_____ 1, 917, 075. 14

Of the foregoing amount payable to the Union Pacific Railroad Company and its affiliates, the amount determined and agreed upon in the final settlement as accruing for 1920 was $230,601.78.

The rental interest in the full amounts above listed was accrued by the several companies, except the Los Angeles & Salt Lake Railroad Company, in their accounts and returned as taxable income for years prior to the year 1921.

In his determination of consolidated tax liability for 1921 the respondent has held that the rental interest was not accruable by the companies during the period of Federal control and has included in the income of the companies and in consolidated income for 1921 the rental interest, $1,917,075.14, due the companies for the whole period of Federal control, except a portion thereof which he included in income for 1918.

Counsel for respondent concedes that in a long line of cases the Board has held that rental interest received in final settlement with the Director General constitutes income during the period of Federal control rather than in a later year of final settlement or payment. See *Texas & Pacific Ry. Co.*, 9 B. T. A. 365; *Missouri Pacific R. R. Co.*, 22 B. T. A. 267; *St. Louis Southwestern Ry. Co.*, 24 B. T. A. 917.

In the letter of the Director General of March 4, 1920, above referred to, after the statement fixing rates of interest at specified amounts, there is a paragraph in which it is stated that instructions would be issued to fix the rate in each case accordingly, " unless the conditions of the particular case call for different treatment." Counsel for respondent refers to this as an exception and says there is nothing to show that the carriers here did not fall within such exception. We do not understand that this is in any way an issue in the case. The pleadings are drawn and the evidence directed to the issue of whether the rental interest was income for 1921, rather than the Federal control years. There is no hint in the pleadings, the oral statements of counsel at the trial, in the evidence, or anywhere in the record that the respondent ever considered these cases as coming within the so-called exception of the Director General's policy. We accordingly refuse to find that the present cases differ on the facts from those above cited on this issue and hold for the petitioners that the rental interest was income for prior years.

The parties are agreed that the amount of $230,601.78 accrued to the Union Pacific Railway Company and its affiliated companies as rental interest for 1920 and that such sum should be included in income for that year. The parties are agreed that the several companies, "except the Los Angeles & Salt Lake Railroad Company," accrued the rental interest and returned it as income for years prior to 1921. The Los Angeles & Salt Lake Railroad Company did not enter the affiliation until 1921 and it is not a petitioner for any year prior thereto, and it accordingly appears that no adjustment of income will need be made for 1920—the first year before us—on account of the failure of that company to accrue the rental interest due it.

ISSUE L.—*Whether the Union Pacific Railroad Company sustained a deductible loss in 1921 through the exchange of bonds of other companies for bonds of the Los Angeles & Salt Lake Railroad Company under a contract with W. A. Clark.*—Prior to the transaction hereinafter described the Union Pacific Railroad Company, hereinafter called Union Pacific, owned all the stock of the Oregon Short Line Railroad Company, hereinafter called Oregon Short Line. The Oregon Short Line in turn owned (1) all the stock of the Oregon-Washington Railroad & Navigation Company, hereinafter called Navigation Company, and (2) one-half the stock and bonds of the Los Angeles & Salt Lake Railroad Company, hereinafter called the Salt Lake Company. The remaining one-half of the stock and bonds of the Salt Lake Company was owned largely by W. A. Clark and members of his family. The total issue of Salt Lake stock was 250,000 shares, and the total outstanding issue of bonds, which were 4 per cent, first mortgage bonds, amounted to something over $58,000,000 face value.

Under date of April 27, 1921, the Union Pacific and Clark entered into an agreement by which the Union Pacific agreed to buy the 125,000 shares of Salt Lake Company stock then owned by Clark and his family at $20 a share.

By the same agreement the Union Pacific agreed to accept delivery from Clark, and Clark agreed to deliver, at least $25,000,000 face value of Salt Lake Company bonds in exchange for the following bonds to be delivered by the Union Pacific: (1) Navigation Company first and refunding mortgage 4 per cent bonds, guaranteed by the Union Pacific, to a principal amount equal to 50 per cent of the principal of the Salt Lake bonds delivered; (2) Southern Pacific Railroad Company first refunding mortgage 4 per cent bonds to a principal amount equal to 30 per cent of the principal of the Salt Lake bonds delivered; (3) San Francisco Terminal first mortgage 4 per cent bonds, issued by the Southern Pacific Company to a princi-

pal amount equal to 20 per cent of the principal of the Salt Lake bonds delivered.

By the same agreement the Union Pacific also agreed to accept delivery of any and all additional Salt Lake bonds, and to make exchange therefor upon the same terms, whether tendered by Clark or by other holders. The agreement also provided for a cash adjustment by the Union Pacific in lieu of undeliverable fractions of the Southern Pacific bonds called for upon the exchanges.

Pursuant to the agreement, during 1921 bonds of the Salt Lake Company of the face value of $29,470,000 were delivered to the Union Pacific, which gave in exchange therefor the following bonds:

| Issuing company | Face value | Cost to Union Pacific |
|---|---|---|
| Navigation Co | $14,735,000 | $13,261,500.00 |
| Southern Pacific Co | 8,815,500 | 8,063,537.85 |
| San Francisco Terminal | 5,894,000 | 5,157,250.00 |

Some of the bonds delivered by the Union Pacific had been acquired by it prior to March 1, 1913, and as to such bonds cost was lower than fair market value at March 1, 1913. The Salt Lake bonds acquired by the Union Pacific in 1921 had a readily realizable value, and the fair market value at the time of acquisition by the Union Pacific was not in excess of 72.15 per cent of their face value, or an aggregate value of $21,262,605.

The difference between the cost to the Union Pacific of the bonds delivered by it in exchange for the Salt Lake bonds in 1921, and the market value of the Salt Lake bonds received, was as follows:

Delivered by Union Pacific:

| | | |
|---|---|---|
| Navigation bonds (cost) | | $13,261,500.00 |
| Southern Pacific bonds (cost) | | 8,063,537.85 |
| San Francisco Terminal bonds (cost) | | 5,157,250.00 |
| Total cost | | 26,482,287.85 |

Received by Union Pacific:

| | | |
|---|---|---|
| Salt Lake bonds (value) | $21,262,605.00 | |
| Less cash adjustment | 23,630.14 | |
| | | 21,238,974.86 |
| Difference | | 5,243,312.99 |

The Navigation Company bonds exchanged for Salt Lake bonds in 1921 were acquired by the Union Pacific in 1914 in anticipation of legislation which was expected to impose restrictions on the issuance of securities, and the Union Pacific contemplated guaranteeing and selling them at some future time. After the bonds were acquired by the Union Pacific there was no satisfactory market for them, in view of their low interest rate, and as the company had other re-

sources, it continued to hold the bonds until the time of the exchange in 1921.

The Union Pacific had two objects in view in entering into the contract of April 27, 1921. One was to gain operating control of the Salt Lake Railroad. As matters stood before the exchange in 1921, half of the Salt Lake Company directors were elected by the Clark interests and half by Union Pacific interests. Clark was president of the company. These two interests were harmonious, but the Union Pacific deemed it advisable to secure sole control so as to have all operating matters and traffic arrangements exclusively under its direction, and also for the purpose of having its own entrance into southern California, which it did not then have. The other object was to place the Union Pacific in better position for further financing when needed. The Union Pacific had no mileage available upon which to place first liens for new financing, and so it was considered advisable to acquire the Salt Lake bonds, which could then be canceled and the mortgage discharged, and thus have available substantial mileage against which to issue new first mortgage bonds. The Union Pacific never contemplated selling the Salt Lake bonds, and it still holds them. Petitioner Union Pacific contends that the difference between the cost of the bonds delivered by it in 1921 and the value of the Salt Lake bonds received by it in the exchange above described constituted a deductible loss in 1921. The parties are agreed upon the basic figures, but respondent contends that the exchange was one under which gain or loss is not recognized by the Revenue Act of 1921 and the regulations issued thereunder.

The applicable section of the Revenue Act is section 202, subsections (c) and (c) (1), as follows:

For the purposes of this title, on an exchange of property, real, personal or mixed, for any other such property, no gain or loss shall be recognized unless the property received in exchange has a readily realizable market value; but even if the property received in exchange has a readily realizable market value, no gain or loss shall be recognized—

When any such property held for investment, or for productive use in trade or business (not including stock-in-trade or other property held primarily for sale), is exchanged for property of a' like kind or use.

Petitioner's contention is that the exchange was not an exchange of property held for investment or productive use in trade or business for property of a like kind or use, and hence the loss sustained on the exchange is one that is recognized by the Revenue Act.

In the argument the exchange is separated into two parts, first, the exchange of the Navigation Company bonds, and, second, the exchange of the Southern Pacific and San Francisco Terminal bonds.

Petitioner argues that the Navigation Company bonds were held primarily for sale, and hence they come within the exception in

section 202 (c) (1), and argues further that bonds of a wholly owned subsidiary are not held by the parent as an investment or for productive use, because the ownership of the stock insures to the parent the realization of the net income of the subsidiary available for distribution. Under section 202 (c) (1) gain or loss is recognized on an exchange involving "stock-in-trade or other property held primarily for sale." We find considerable difficulty in accepting petitioner's view that the Navigation bonds were property held primarily for sale. The evidence is that the Union Pacific acquired the bonds originally in the hope of having them for sale free from the restriction of the then anticipated legislation for the regulation of the issuance of securities. But from 1914 to 1921 the petitioner continued to own and hold the bonds. There is no evidence that it made any attempt to sell them. There is testimony that after they were acquired there was practically no market for 4 per cent bonds. We should like more information than this. We are not informed to what extent the market for such bonds dropped. For all we know it might have been possible for the Union Pacific to have disposed of the bonds at a profit even though the market for such bonds fell somewhat. Granting that the Navigation bonds were acquired with the intent of ultimately selling them, it does not follow that they were not held in the meantime for investment. The two objectives are not inconsistent. Nor do we think that the ownership of all the stock of the subsidiary is determinative of whether the bonds were held as an investment. Had any of the bonds been held by outside interests the earnings available for distribution to the parent would have been reduced by the amount of interest on such bonds. Under the rule of " ejusdem generis " we construe the phrase " or other property " as including property of the same general nature as stock-in-trade, that is, property acquired for sale and openly and continuously offered for sale to the public. Stocks or bonds might well be considered the stock-in-trade of a dealer in securities. But dealing in securities was not the business of petitioner in this case. The fact that it proposed at some time to dispose of the bonds, after enhancing their value by endorsement, in our opinion does not bring petitioner within the intent of the statute. The burden of proof is on petitioner to establish that the Navigation bonds were not held for investment, R. D. Davis, 21 B. T. A. 1078, and it has not proven its case to our satisfaction.

The parties are agreed that the record does not show whether the Southern Pacific and San Francisco Terminal bonds were held by the Union Pacific for investment prior to the exchange in 1921, but petitioner assumes for the purpose of argument that they were so held. The petitioner further concedes that the bonds delivered and those received in the exchange were property of " a like kind."

1138

Inasmuch as the statute provides for nonrecognition of gain or loss " when property held for investment * * * exchanged for property of like kind or use," it would seem that the concession of petitioner that the bonds exchanged were of like kind would bring the transaction within the statute. But the argument is advanced that in *Greene et al., Trustees*, 15 B. T. A. 401; affd., 42 Fed. (2d) 852; and *Edson* v. *Lucas*, 40 Fed. (2d) 398, it was held that the phrase " property of a like kind or use " is not to be regarded as disjunctive, but as a conjunctive expression. Under this construction of the statute it would be necessary that the property received be of like kind *and* use to that delivered in order that gain or loss be not recognized. The *Greene* case decided by the Board does not so hold. That case involved an exchange of investment stock for Federal, state, municipal, and railway bonds which were thereafter held for investment, and we held that the phrase " or use " in the statute applies to property held for investment as well as to property held for productive use in trade or business. It is true that the Circuit Court of Appeals for the Second Circuit, when the case was before it on appeal, stated that, " If of like ' kind ' and ' use ', no gain is to be recognized in the exchange under the statute." We think no one will disagree with that statement. But it is not a holding, as argued by petitioner, that the property must be of like kind *and* use to come within the nonrecognition provisions. In the course of the opinion the phrase " like kind or use " appears several times and nowhere is there any intimation that it is to be construed in the conjunctive. In *Edson* v. *Lucas, supra,* the Board's opinion in the *Greene* case is cited with approval and we find nothing in the opinion of the court to sustain the view contended for by petitioner here.

No reason occurs to us, and none is suggested, why the conjunction " or " should not be construed in its ordinary sense, or wherein the purpose of the statute will be defeated by giving it such construction. As the bonds delivered and those received by the Union Pacific were admittedly of " like kind," we hold that under the statute the respondent correctly refused to recognize any loss on the exchange.

Granting that some effect should be given to the words " or use " in the statute, we are still of the opinion that the exchange here was one on which no loss can be recognized. The bonds delivered by the Union Pacific were held for investment. The Salt Lake bonds received by it were acquired not for sale, but for the purposes of placing the Union Pacific in better position for future financing. It intended, through cancellation of the bonds and the underlying mortgage, to enhance the value of its property and thus make its future

bond issues more attractive to the investing public. " To invest imports a laying out of money, or money's worth * * * by the concern itself in acquiring something of permanent use in the business." *La Belle Iron Works* v. *United States,* 256 U. S. 377. Here, the Union Pacific, by buying up the stock of the Salt Lake, acquired operating control of the railroad, but that road was burdened with the outstanding mortgage and bonds and was of little value for financing purposes; by taking up the bonds the Union Pacific acquired it free from obligations, and this, its bankers advised it, would be most helpful in getting a good price for its bonds. Viewing the transaction in this way, it seems to us that it can properly be said that the Salt Lake bonds were acquired for investment purposes in that the Union Pacific thereby acquired " something of permanent use in the business."

The amendment to section 202 (c) (1) of the Revenue Act of 1921 made by the Act of March 4, 1923, was effective as of January 1, 1923, and does not affect the transaction here involved. *Florence G. Baldwin,* 23 B. T. A. 512.

Issue M for 1921 and 1922; Issue F for 1923.—*Whether the Oregon-Washington Railroad & Navigation Company is entitled to deductions for amortization of bond discount.*—The respondent, in his brief, concedes that the deductions claimed are allowable. The proper computations will be made under Rule 50.

Issue O for 1921 and 1922; Issue G for 1923.—*Whether a net loss of the Los Angeles & Salt Lake Railroad Company incurred in 1921 prior to affiliation is allowable as a deduction after affiliation in 1921, 1922 or 1923.*—On or about May 1, 1921, the Los Angeles & Salt Lake Railroad Company, hereinafter called the Salt Lake Company, and its controlled company, Las Vegas Land & Water Company, became affiliated with the Union Pacific Railroad Company. Pursuant to a specific ruling of the respondent, the Salt Lake Company filed a separate income-tax return, including its controlled company, for the first four months of 1921; the Salt Lake Company's income and deductions, and those of its controlled company, for the remaining eight months of 1921 were included in the consolidated return filed by the Union Pacific Railroad Company for itself and its other affiliated companies for 1921.

For the first four months of 1921 the Salt Lake Company and its controlled company sustained a net loss, computed in accordance with the method prescribed in section 204 of the Revenue Act of 1921, in the amount of $495,495.84 which amount was not absorbed or deducted in the consolidated return filed for the remainder of the year. In the last eight months the Salt Lake Company and its controlled company sustained a net loss of $711,013.82, which was

absorbed or offset by the net income of other affiliated companies included in the consolidated return filed by the Union Pacific Railroad Company.

For the year 1922 the Salt Lake Company and its controlled company again sustained a net loss and therefore contributed no net income to the consolidated net income returned ·by the Union Pacific Railroad Company for itself and its affiliated companies for that year.

For the year 1923 the Salt Lake Company and its controlled company contributed to the consolidated net income returned by the Union Pacific Railroad Company for itself and its affiliated companies for that year, a net income exceeding the sum of $495,495.84.

In the determination of consolidated tax liability of petitioners and their affiliated companies for the last eight months of 1921 and for the years 1922 and 1923 the respondent has not allowed the deduction of any part of the net loss sustained by the Salt Lake Company and its controlled company in the first four months of 1921.

Petitioner's principal contention now is that the net loss for the first four months of 1921 should be allowed as a deduction in computing net income of the Salt Lake Company and its controlled company for 1923, which year, it says, is the " next succeeding taxable year " in relation to 1921. It is urged only alternatively that deduction should be allowed in the last eight months of 1921 or the year 1922.

It is clear, we think, that no deduction can be allowed in the last eight months of 1921 or the year 1922, as the Salt Lake and its controlled company had further net losses in that period and year. The net loss provisions of the statute do not contemplate the addition of a loss to a loss and the deduction of 'the sum from income of other affiliates. *Woolford Realty Co.* v. *Rose*, 286 U. S. 319; *New Castle Leather Co.*, 26 B. T. A. 282.

We think it equally clear that the Salt Lake Company is entitled to the deduction claimed if, as contended, the year 1923 is the next succeeding taxable year in relation to the first four months of 1921 in which the loss was sustained. In the *Woolford Realty Co.* case, *supra*, the court said:

Under that section of the statute [sec. 206(b), Revenue Act of 1926], the losses suffered by the Piedmont Company in 1925 [prior to affiliation] might have been deducted from its net income in 1926, and might thereafter if not extinguished, have been deducted to the extent of the excess from its net income in 1927, the year in which its shares were acquired by the petitioner.

In *General Box Corporation*, 22 B. T. A. 725, corporations which were separate in 1921 and the first two months of 1922 became affil-

iated at March 1, 1922, and remained affiliated throughout the remainder of 1922 and the year 1923. The question there was whether net losses sustained by certain of the companies in 1921 and 1922 could be carried over in view of the fact that 1922 involved two periods, that is, a part of the year in which there was no affiliation and a part in which the companies were affiliated. We held that the two periods in 1922 did not constitute taxable years within the meaning of section 204 (b) of the Revenue Act of 1921, and that in regard to the 1921 net losses the entire year 1922 was the succeeding taxable year and 1923 the next succeeding taxable year. We further held that with respect to the 1922 net losses the year 1923 was the succeeding taxable year. The same reasoning applied here leads to the conclusion that in relation to 1921 the next succeeding taxable year of the Salt Lake Company and its controlled company is the calendar year 1923 and the unabsorbed net loss for 1921 may be carried over and used as a deduction in 1923. See *Delaware & Hudson Co. et al.*, 26 B. T. A. 520.

ISSUE P FOR 1920, 1921 AND 1922; ISSUE H FOR 1923.—*Whether deductions are allowable for amortization of discounts and commissions on bonds issued by Union Pacific Railroad Company and Oregon Short Line Railroad Company prior to 1913.*—All of the findings of fact proposed by petitioners relating to these issues are agreed to by respondent, and we adopt them as our findings. For the purpose of this report it will be sufficient to say that prior to 1913 the two railroads sold several issues of bonds at varying rates of discount and in connection with the sales paid commissions to bankers. The railroads claim, and the respondent has refused to allow, deductions in the taxable years for the discounts and commissions amortized over the life of the bonds. The amounts claimed are summarized as follows:

| Item | Discount | Commissions |
|------|---------:|------------:|
| Convertible bonds | $161,011.35 | $6,708.80 |
| First lien and refunding bonds | 5,285.20 | 12,143.77 |
| Refunding bonds | 85,600.00 | 38,400.00 |
| Total annual deduction claimed | 251,896.55 | 57,252.57 |

Counsel for respondent concedes that in *Chicago, Rock Island & Pacific R. R. Co.*, 13 B. T. A. 988, we decided the question of amortization of bond discount adversely to him. In accordance with that decision, we hold that petitioners here are entitled to the deductions claimed on account of bond discount.

The other question under these issues has been decided against the petitioners' claims in the *Chicago, Rock Island & Pacific* case, *supra*, at pages 1034, 1035, and in *Kansas City Southern Ry. Co.*, 22 B. T. A.

949, 966. We have carefully considered petitioners' arguments against the propriety of the decisions cited, but we are not convinced that they are wrong and so we adhere to them in the present proceedings and hold that petitioners are not entitled to the deductions claimed on account of commissions.

Issue 8.—*Whether the proper basis for charging out materials and supplies to operating expenses is the cost thereof to the carrier at the time when taken over by the Director General or the cost thereof in the inventory of the Director General when returned to the carrier.*— We adopt as our findings the findings proposed by petitioners, all of which are agreed to by counsel for the respondent. Briefly, the facts are that when the Director General took over the railroads of the Union Pacific and two of its affiliated companies under the Federal Control Act, he also took over certain materials and supplies, and in the compensation contract the Director General agreed that on the termination of Federal control he would return to the railroads materials and supplies " equal in quantity, quality, and relative usefulness to that of the materials and supplies which he received." At the end of Federal control on March 1, 1920, the Director General returned to the railroads materials and supplies having an aggregate book value or cost in excess of the book value or cost of supplies taken over by him at the beginning of the Federal control period. In the use of such materials and supplies in 1920 the railroads charged them out at the cost figure at which they were carried in the Director General's inventory and made corresponding charges to operating expenses, which were in excess of the cost of the materials and supplies as carried in the inventories of the railroads as of December 31, 1917. The respondent determined that the excess amount so charged to operating expenses was $2,422,321.08, but the parties have stipulated that $195,015.22 thereof is applicable to materials and supplies used for additions and betterments charged to property investment accounts, leaving an amount of $2,227,305.86 which respondent says should be included in income.

As we understand the issue here, it is simply whether petitioners made excessive charges to operating expenses in charging out materials and supplies at the figure shown in the Director General's inventory when returned, rather than at the figure shown in petitioners' inventory when the property was taken over. There is no question as to whether the return of materials and supplies was in compliance with the contract between petitioners and the Director General, nor as to whether there was any cash adjustment which might result in a new basis.

In several previous cases we have sustained the respondent on this issue, holding that the proper basis for charging out materials and

supplies is the cost of those surrendered and not the increased value thereof when returned. *Terminal R. R. Assn. of St. Louis*, 17 B. T. A. 1135; *Missouri Pacific R. R. Co.*, 22 B. T. A. 267; *Kansas City Southern Ry. Co.*, 22 B. T. A. 949. The Court of Claims decided the same way in *Chicago Junction Rys. & Union Stock Yards Co.* v. *United States*, 72 Ct. Cls. 639.

Petitioners ask reconsideration of our previous holdings, on the ground that since then the Interstate Commerce Commission has rendered a decision holding that, for purposes of determining railway operating income under the recapture provisions of the Interstate Commerce Act, the cost of materials and supplies used in maintenance should be taken to be " their cost as shown in the final settlement with the Director General  *  *  *  rather than the cost of like materials some years previously." *Excess Income of Richmond, Fredericksburg & Potomac R. R. Co.*, 170 I. C. C. 451, 516. Granting that the rulings of the Interstate Commerce Commission are persuasive authority, it is established by *Old Colony R. R. Co.* v. *Commissioner*, 284 U. S. 552, that they are not binding in matters of Federal taxation. In that case it was contended by the Commissioner of Internal Revenue that inasmuch as the Commission required the railroad to treat the annual amount of premium amortization as income, it should be treated the same way for tax purposes. The court held that:

* * * the rules of accounting enforced upon a carrier by the Interstate Commerce Commission are not binding upon the Commissioner; nor may he resort to the rules of that body, made for other purposes, for the determination of tax liability under the revenue acts. [Citing cases.]

Upon consideration, we are of the opinion that our previous decisions on this question are sound and we adhere to them in the present proceedings.

Issue V.—*Whether taxes for 1920 upon the net income of the petitioners that were under Federal control should be apportioned between the Director General and the petitioners, and if so, how the apportionment should be made.*—Several of the petitioners, listed in petitioners' proposed findings and agreed to by respondent, were under Federal control during the entire Federal control period, which ended February 29, 1920, and pursuant to the Federal Control Act of March 21, 1918, the Director General entered into contracts with the several petitioners fixing the compensation and other terms governing the use of the properties taken over.

By section 6 of the Federal control contracts it was provided in substance that during the period of Federal control the Director General would either pay, or save the petitioners harmless from, the 2 per cent normal income tax imposed by the Revenue Act of

1916 and in effect carried over to subsequent years by section 230 (b) of the Revenue Act of 1918, the petitioners to bear the remainder of the taxes imposed by the 1918 Act. Section 6 (d) of the contracts provided as follows:

> If any such tax is for a period which began before January 1, 1918, or continues beyond the period of Federal control, such portion of such tax as may be apportionable to the period of Federal control shall be paid by the Director General, and the remainder shall be paid by the Companies.

Following the return to petitioners of their properties on March 1, 1920, the Director General, pursuant to the Federal control contracts, recognized the obligation to bear one-sixth of the 2 per cent income tax upon the net income of the petitioners for the year 1920, and accordingly paid the sum of $102,874.62 as representing such portion of said tax.

In determining the deficiencies herein the respondent computed the income taxes of petitioners for the entire year 1920 at the rate of 10 per cent.

In computing consolidated tax liability for the year 1920 the respondent allowed as a credit the amount of $3,188,995.84 as representing taxes assessed and paid on the original return filed, which amount included the $102,874.62 paid by the Director General as aforesaid. The parties agree that the correct amount of the credit allowable in this respect is $3,086,121.22.

The respondent concedes that he erred in applying the 10 per cent rate for the entire year. His position now is that he should give effect to the 2 per cent normal tax borne by the Director General by applying an 8 per cent rate to income for the months of January and February, 1920, and 10 per cent to income for the remainder of the year. Petitioners contend that the tax should be computed in the first instance at the 10 per cent rate for the full year, and then the portion thereof of which they were to be relieved should be computed at the rate of one-sixth of the 2 per cent tax, the two-month period of Federal control in 1920 being one-sixth of the full year. The result of petitioners' method is to relieve them of tax to the extent of one-third of 1 per cent of their entire year's net income, leaving 9⅔ per cent tax upon income for the full year to be borne by them.

Petitioners base their contentions on the provisions of the compensation contracts, the method of settlement thereunder, and the provisions of the Federal Control Act. The respondent replies that the contracts and the Federal Control Act can have nothing to do with the determination of tax liability, which is governed solely by the Revenue Act of 1918. The respondent's position in this respect seems to us unsound, inasmuch as section 230 (b) of the Revenue Act of 1918 refers to the Federal Control Act and reduces the taxes to be

borne by the carrier to conform to the provisions of the Control Act. In *New York, Ontario & Western Ry. Co.*, 1 B. T. A. 1172, we held that the two acts must be considered in *pari materia*. Approaching the question from this angle, we find that section 12 of the Federal Control Act, dealing with taxes, provides in part that:

If Federal control begins or ends during the tax year for which any taxes so chargeable to railway tax accruals are assessed, the taxes for such year shall be apportioned to the date of the beginning or ending of such Federal control * * *.

The term "taxes so chargeable to railway tax accruals," as we understand it, refers to the 2 per cent tax. If this is correct, petitioners' construction would seem to be justified. The statute directs that "the taxes for such year shall be apportioned." It does not require that the income shall be apportioned and the tax computed on the income for each period, as the respondent contends should be done. The contracts between the petitioners and the Director General were entered into pursuant to the Federal Control Act and, as appears from section 6 (d) above quoted, embody the same idea expressed in the statute. The section quoted provides that the part of the 2 per cent tax to be borne by the Director General shall be "such portion of such tax as may be apportionable to the period of Federal control." It would have been a simple matter to provide in the statute and contracts that the Director General should bear a part of the tax based on the net income apportionable to the period of Federal control had that been the intent of Congress and of the contracting parties. The petitioners allege, and the respondent admits, that "the Director General, in final settlement, recognized the obligation to bear one-sixth of the 2 per cent tax upon the net income of said companies for the year 1920 under the Revenue Act of 1918." Thus we find that the parties in interest recognized their respective liabilities under the statute and contracts to be as we here construe them, namely, that the Director General should bear an apportioned part of the 2 per cent tax computed for the whole year, the balance to be borne by the carriers.

Moreover, the respondent's method does violence to the fundamental theory that income taxes are levied on annual income. *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359. We see no such exceptional feature in the present case as would warrant a departure from the general rule.

At the close of the hearing the parties agreed upon adjustments to be made with respect to bond discount and expense amortization on two series of trust equipment certificates. These adjustments, and others necessitated by the confessions and agreements of the parties and by this opinion, will be made under Rule 50.

*Decision will be entered under Rule 50.*