## Appeal of NEW YORK, ONTARIO & WESTERN RAILWAY CO.    Docket No. 974.

By the Federal Control Act and the compensation agreement pursuant thereto the Director General of Railroads was required to and did bear the income tax on the taxpayer's income up to 2 per cent.

The amount so borne by the Director General was not income of the taxpayer.

The United States in levying taxes and in assuming the obligations of Federal control was the same sovereign entity.

The Commissioner of Internal Revenue in assessing taxes is not confined to the provisions of the revenue acts alone, but must determine liability in the light of all statutes relating thereto.

A refusal of the Supreme Court to grant a writ of certiorari will not be regarded as an affirmance of the decision below.

Submitted April 20, 1925; decided May 21, 1925.

*C. L. Andrus, S. T. Bledsoe, Alfred P. Thom, C. C. Paulding*, and *Gordon M. Buck, Esqs.*, for the taxpayer.

*Percy S. Crewe*, and *Laurence Graves, Esqs.*, for the Commissioner.

*John E. McClure, Esq.*, amicus curiae.

Before STERNHAGEN, LITTLETON, MARQUETTE, and TRAMMELL.

This appeal presents the question whether the 2 per cent portion of the income tax borne by the Director General of Railroads, computed upon the taxpayer's income for the calendar years 1918 and 1919, when its property was under Federal control, constituted income to the taxpayer. The facts alleged in the petition are substantially admitted in the Commissioner's answer and there is no dispute in respect thereof.

#### FINDINGS OF FACT.

The taxpayer during the period in question was a common carrier corporation subject to the Interstate Commerce Act. On December 28, 1917, the President of the United States by proclamation dated December 26, 1917, took possession and assumed control of its railroad properties. By such proclamation the President appointed a Director General of Railroads for the effective operation of the railroads under Federal control. From December 28, 1917, until March 1, 1920, the taxpayer's railroad was held and operated by the Director General on behalf of the President. On November 1, 1918, a contract was executed between the Director General, acting on behalf of the United States and the President pursuant to the Federal Control Act of March 21, 1918, and the taxpayer. The terms of this contract are in accordance with the provisions of the Federal Control Act.

Of the amount of Federal income taxes computed in respect of the income of the taxpayer, the Director General, pursuant to the Federal Control Act and the compensation agreement, bore for the year 1918 $14,500.22 and for the year 1919 $15,574.85. These amounts were among the taxpayer's " railway tax accruals " as officially prescribed by the Interstate Commerce Commission in its " Classification of Income, Profit and Loss, and General Balance Sheet Accounts for Steam Roads," effective on July 1, 1914. Pursuant to the Federal Control Act, the Interstate Commerce Commission, in computing the average annual railway operating income for the three years ended June 30, 1917, deducted " railway tax accruals " from " net revenue from railway operations," and such railway tax ac-

cruals in the computation of the taxpayer's standard return for such test period included the 2 per cent Federal income tax.

The Commissioner, in auditing the taxpayer's returns for the taxable years in question, added to the taxpayer's net income the amounts of $14,500.22 for 1918 and $15,574.85 for 1919, and determined a deficiency for each of the years in question based upon such increase of net income.

### DECISION.

The amounts of $14,500.22 for 1918 and $15,574.85 for 1919, being the 2 per cent tax borne by the Director General, are not income of the taxpayer. The taxpayer's liability should be recomputed in accordance with this decision and the following opinion, and final order will be made on consent or on 15 days' notice under Rule 50.

### OPINION.

STERNHAGEN : The issue presented by this appeal is sharply drawn. It affects every railroad corporation in the United States whose properties were under Federal control during the years 1918 and 1919 and whose income during those years was sufficient to be taxable. Although the Revenue Act of 1918 imposed an income tax of 12 per cent for 1918 and 10 per cent for 1919 upon the net income of corporations, the Federal Control Act provided that the amount of the tax up to 2 per cent of the net income should be borne by the Director General out of the railway operating revenues which he received. Thus, as expressly recognized in the Revenue Act of 1918, section 230 (b), the taxpayer, instead of paying 12 per cent and 10 per cent respectively, paid only 10 per cent and 8 per cent respectively. The Commissioner contends that the amount so borne was paid by the Director General in behalf of the taxpayer and should be included in gross income. The taxpayer appeals because it insists that the Revenue Act and the Federal Control Act, when read together in the light of the general plan for Federal operation during the war, fix its tax liability at 10 per cent and 8 per cent respectively, and the so-called payment by the Director General was not in behalf of the taxpayer, but was a duty imposed upon him for the purpose of assuring to the taxpayer the just compensation for the use of its properties contemplated by the Federal Control Act. The taxpayer contends that the Commissioner's view would defeat the plan for just compensation and would yield compensation less than that intended and that upon which the standard compensation agreement was based.

The statement of the propositions relied upon indicates the necessity for setting forth at some length the provisions of the several statutes involved and the terms of the compensation agreement. And in order properly to understand these statutes it is necessary to consider some of the circumstances existing at the time of their enactment.

We need not linger over the conditions existing when the President of the United States believed it necessary for the effective conduct of the war to assume the operation and control of the transportation systems of the country. He issued his proclamation on December 26,

1917, taking possession of such transportation systems at noon of December 28, 1917, and placing such possession, control, and operation in charge of a Director General appointed for the purpose. Thereafter the President acted entirely through the Director General, who represented him and the United States. The taking did not create the relation of lessor and lessee, but was a taking by the United States " in its sovereign capacity, as a war measure, 'under a right in the nature of eminent domain,' *North Carolina R. R. Co.* v. *Lee,* 260 U. S. 16; *Missouri Pacific R. R. Co.* v. *Ault,* 256 U. S. 554; *Northern Pacific Ry. Co.* v. *North Dakota,* 250 U. S. 135; *In re Tidewater Coal Exchange,* 280 Fed. 648, 649." *DuPont de Nemours & Co.* v. *Davis,* 264 U. S. 456, 462.

In taking over these properties from their owners provision was to be made for just compensation. The President designated one of the members of the Interstate Commerce Commission to draft a statute to cover the subject in its various aspects, both to assure full power of operation and control in the Director General and to assure proper compensation to the carriers. The method of compensation was based primarily upon the thought that the carrier should receive an annual amount " not exceeding a sum equivalent as nearly as may be to its average annual railway operating income for the three years ended " June 30, 1917. These three years are commonly spoken of as the test period. The Interstate Commerce Commission had officially prescribed a system of railway accounts, and this system gave a precise meaning to the expression " average annual railway operating income." See order dated May 19, 1914, " Classification of Income, Profit and Loss, and General Balance Sheet Accounts for Steam Roads," effective July 1, 1914, page 27.[1] Railway operating income is the result of subtracting railway tax accruals and uncollectible railway revenues from net revenue from railway operations. That is to say, the just compensation which each carrier was to receive was an amount left after railway tax accruals (except war taxes) had been accounted for. Railway tax accruals, as shown by the official designation contained in the Interstate Commerce Commission's classification already referred to (page 19), included " accruals for taxes of all kinds (including Federal income tax). . . ."

When entrance into the war made necessary additional war revenue, the Act of October 3, 1917, Title I, while not disturbing the 2 per cent tax then in effect under the Act of September 8, 1916, imposed " in addition " a like tax of 4 per cent. Title II also imposed the war excess-profits tax. This was the status of the revenue law at the beginning of Federal control on December 28, 1917, and

---

[1] I. Operating income:
    501. Railway operating revenues.
    531. Railway operating expenses.
        Net revenue from railway operations.
    532. Railway tax accruals.
    533. Uncollectible railway revenues.
        Railway operating income.
    502. Revenues from miscellaneous operations.
    534. Expenses of miscellaneous operations.
        Net revenue from miscellaneous operations.
    535. Taxes on miscellaneous operating property.
        Miscellaneous operating income.
        Total operating income.

also at the time of the enactment of the Federal Control Act of March 21, 1918.

With this history before it, Congress passed the Federal Control Act, to provide not only " for the operation of transportation systems while under Federal control" but also " for the just compensation of their owners." This act has been several times considered by the Supreme Court in the cases above cited, and it is no longer open to dispute that the possession, control, and operation of the transportation systems of the country were in the United States in its sovereign capacity, the Director General being merely the designated representative of the Government. It was the same sovereign, acting through its legislative branch, which provided just compensation to the carriers for the use of their property in war time and levied taxes for the collection of war-time revenues. It was the same United States as had the power through its control of interstate commerce to transcend the power of the States to fix intrastate rates, *Northern Pacific Ry. Co.* v. *North Dakota*, 250 U. S. 135; and the same United States as could successfully defend a local suit for penalty because it had not consented to be thus sued, *Missouri Pacific R. R. Co.* v. *Ault*, 256 U. S. 554.

Section 1 of the Federal Control Act provides in part:

That the President, having in time of war taken over the possession, use, control, and operation (called herein Federal control) of certain railroads and systems of transportation (called herein carriers), is hereby authorized to agree with and to guarantee to any such carrier making operating returns to the Interstate Commerce Commission, that during the period of such Federal control it shall receive as just compensation an annual sum, payable from time to time in reasonable installments, for each year and pro rata for any fractional year of such Federal control, not exceeding a sum equivalent as nearly as may be to its average annual railway operating income for the three years ended June thirtieth, nineteen hundred and seventeen.

That any railway operating income accruing during the period of Federal control in excess of such just compensation shall remain the property of United States . . .

Every such agreement shall provide that any Federal taxes under the Act of October third, nineteen hundred and seventeen, or Acts in addition thereto or in amendment thereof, commonly called war taxes, assessed for the period of Federal control beginning January first, nineteen hundred and eighteen, or any part of such period, shall be paid by the carrier out of its own funds, or shall be charged against or deducted from the just compensation; that other taxes assessed under Federal or any other governmental authority for the period of Federal control or any part thereof, either on the property used under such Federal control or on the right to operate as a carrier, or on the revenues or any part thereof derived from operation (not including, however, assessments for public improvements or taxes assessed on property under construction, and chargeable under the classification of the Interstate Commerce Commission to investment in road and equipment), shall be paid out of revenues derived from railway operations while under Federal control; that all taxes assessed under Federal or any other governmental authority for the period prior to January first, nineteen hundred and eighteen, whenever levied or payable, shall be paid by the carrier out of its own funds, or shall be charged against or deducted from the just compensation.

Section 10 provides that rates may be increased (as they were by Dir. Gen. G. O. 28) in order to provide railway operating expenses, railway tax accruals other than war taxes, joint facility rents and just compensation.

Section 12 is as follows:

That moneys and other properties derived from the operation of the carriers during Federal control are hereby declared to be the property of the United

States. Unless otherwise directed by the President, such moneys shall not be covered into the Treasury, but such moneys and property shall remain in the custody of the same officers, and the accounting thereof shall be in the same manner and form as before Federal control. Disbursements therefrom shall, without further appropriation, be made in the same manner as before Federal control and for such purposes as under the Interstate Commerce Commission classification of accounts in force on December twenty-seventh, nineteen hundred and seventeen, are chargeable to operating expenses or to railway tax accruals and for such other purposes in connection with Federal control as the President may direct, except that taxes under Titles One and Two of the Act entitled "An Act to provide revenue to defray war expenses, and for other purposes," approved October third, nineteen hundred and seventeen, or any Act in addition thereto or in amendment thereof, shall be paid by the carrier out of its own funds. If Federal control begins or ends during the tax year for which any taxes so chargeable to railway tax accruals are assessed, the taxes for such year shall be apportioned to the date of the beginning or ending of such Federal control, and disbursements shall be made only for that portion of such taxes as is due for the part of such tax year which falls within the period of Federal control.

The just compensation thus provided, sometimes known as the standard return, was to be fixed by agreement with each carrier, the terms of the agreement being substantially prescribed by the Federal Control Act, which agreement, as stated in the report of the Senate Committee on Interstate Commerce, would "determine finally and completely all rights as between the Government and the owners, thus avoiding the delays incident to litigation and giving strength and stability to the security market and rendering assistance to our future war financing." The Senate report also contains the following:

Section 1 further provides that ordinary taxes, National and State, shall as now, be paid out of operating revenue; but war taxes accruing under the Act of October 3, 1917, are to be paid by the companies out of their own funds or charged against the standard return. In other words, the holders of railroad securities are by Section 1 (like holders of other securities) to bear their own just portion of the war burden. . . .

The standard return thus provided for will, if accepted by the various operating companies be disposed of substantially as hitherto; that is, for the payment of their fixed charges (and war taxes which remain a burden upon the standard return), for dividends, and if any balance remains for so-called surplus.

From the Congressional Record, Vol. 56, pp. 2506 and 2507, it appears that an attempt was made on the floor of the Senate to have the railroad corporations bear not only the war taxes, thus reducing their average annual railway operating income, but also the 2 per cent income tax. But this amendment was rejected. In the report of the House Committee on Interstate and Foreign Commerce recommending H. R. 9685, which carried the general plan of the statute as finally enacted, appears the following:

Section 1 is a fundamentally important section; for it sets the outside limits of the expected agreements. Its sole function is to provide a basis of such just and proper agreements as may eliminate litigation. This section authorizes the President to make agreements with the operating carriers under which they shall receive in lieu of their constitutional rights the average of their railway operating income for the three years ended June 30, 1917, plus an additional income at some reasonable rate to be fixed by the President upon the cost of additions to their property made during the last six months of 1917. This additional return is allowed for the sake of equality, as it is stated that a comparatively few of the carriers have during this six months period invested more than $200,000,000 in property now applied to public use. Ordinary taxes, Federal and State, are to be paid as hitherto out of operating income. But

war taxes are (in effect) payable out of the standard return; the owners of railroad securities, like the owners of other securities, are thus left to carry their share of the war tax burden.

After the passage of the Federal Control Act negotiations were carried on between the Director General and the railroad owners looking to the execution of individual agreements for just compensation, as provided by the statute. On November 1, 1918, the agreement of the present taxpayer was executed. Section 6 thereof is as follows:

Sec. 6 (a) All taxes assessed under Federal or any other governmental authority for the period prior to January 1, 1918, including a proportionate part of any such tax assessed after December 31, 1917, for a period which includes any part of 1917 or preceeding years, and unpaid on that date, all taxes commonly called war taxes which have been or may be assessed against the Company under the act of Congress entitled "An act to provide revenue to defray war expenses and for other purposes," approved October 3, 1917, or under any act in addition thereto or in amendment thereof, and all taxes which have been or may be assessed on property under construction, and all assessments which have been or may be made for public improvements, chargeable under the accounting rules of the Commission in force December 31, 1917, to investment in road and equipment, shall be paid by the Company; but upon the amount thus chargeable to investment interest shall be paid to the Company during Federal control at the rate provided in paragraph (d) of section 7 hereof. Taxes assessed during construction on additions, betterments, and road extensions made by the Company with the approval or by order of the Director General during Federal control, shall be considered a part of the cost of such additions, betterments, and extensions and shall, under the provisions of paragraph (d) of section 7 hereof, bear interest as a part of such cost from the date of the completion of such additions, betterments, or extensions. Assessments for public improvements which do not become a part of the property taken over shall bear interest from the date of the payment of such assessment.

(b) If any tax or assessment which under this agreement is to be paid by the Company is not paid by it when due, the same may be paid by the Director General and deducted from the next installment of compensation due under section 7 hereof. If any taxes properly chargeable to the Director General have been or shall be paid by the Company, it shall be duly reimbursed therefor.

(c) The Director General shall either pay out of revenues derived from railway operation during the period of Federal control or shall save the Company harmless from all taxes lawfully assessed under Federal or any other governmental authority for any part of said period on the property under such control, or on the right to operate as a carrier, or on the revenues derived from operation, and all other taxes which under the accounting rules of the Commission in force December 31, 1917, are properly chargeable to "railway tax accruals," except the taxes and assessments for which provision is made in paragraph (a) of this section. The Director General shall pay or save the Company harmless from the expense of all suits respecting the classes of taxes payable by him under this agreement.

(d) If any such tax is for a period which began before January 1, 1918, or continues beyond the period of Federal control, such portion of such tax as may be apportionable to the period of Federal control shall be paid by the Director General, and the remainder shall be paid by the Company.

(e) Whenever a period for which a tax is assessed can not be definitely determined, so much of such tax as is payable in any calendar year shall be treated as assessed for such year.

From this it appears that the taxpayer corporation should pay the war taxes, viz, the additional 4 per cent income tax and the war excess profits tax, and that the Director General should bear the remaining Federal taxes included within railway tax accruals, viz, the 2 per cent income tax. We say that the Director General was to bear the burden of this tax in order to avoid whatever con-

fusion may arise through the anomalous statement that the Director General, being the United States, should *pay* the taxes into the United States Treasury; since it is clear from the statute and the agreement that the emphasis was not so much upon the matter of payment by the United States as upon the matter of relieving or saving harmless the corporation from such payment in order to assure the just compensation intended.

Thus far it seems clear that the plan was a careful and consistent method for assuring to the carriers what was regarded as the just compensation believed to be necessary for the taking of their property for public use. Railway accounting was a matter of public concern which had its special official terminology. The statute had been drafted in the light of such accounting after an investigation by a member of the Interstate Commerce Commission, presumably with the most complete knowledge of that terminology; and the language used both in the statute and the compensation agreement was the very language of the official classification of railway accounts. There can be no doubt, therefore, that it was intended by the Federal Control Act to provide to the railroad corporations an amount which would be net to them after the Government had received the 2 per cent income tax but before the Government had received the war taxes.

Subsequently, on February 24, 1919, the Revenue Act of 1918 was enacted, and any doubt which might otherwise exist as to the full knowledge of Congress of the mutual relation, *in pari materia*, of the Federal Control Act and the taxing statutes must be dispelled by the care evidenced in this later act to reflect it. The Federal Control Act placed upon the carriers the burden of paying the so-called war taxes, and these taxes had been described as the taxes imposed by Titles I and II of the Act of October 3, 1917. By the 1918 Act it was obviously intended that only the 2 per cent should be borne by the Director General, even although the income tax levied upon corporations generally was substantially increased from 6 per cent to 12 per cent in 1918 and 10 per cent in 1919. To accomplish this without the necessity of an amendment to modify the language of the Federal Control Act, section 230 of the Revenue Act of 1918 provided:

Sec. 230. (a) That, in lieu of the taxes imposed by section 10 of the Revenue Act of 1916, as amended by the Revenue Act of 1917, and by section 4 of the Revenue Act of 1917, there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax at the following rates:

(1) For the calendar year 1918, 12 per centum of the amount of the net income in excess of the credits provided in section 236; and

(2) For each calendar year thereafter, 10 per centum of such excess amount.

(b) For the purposes of the Act approved March 21, 1918, entitled "An Act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes," five-sixths of the tax imposed by paragraph (1) of subdivision (a) and four-fifths of the tax imposed by paragraph (2) of subdivision (a) shall be treated as levied by an Act in amendment of Title I of the Revenue Act of 1917.

Thus it will be seen that five-sixths of a 12 per cent income tax, viz, all but 2 per cent, and four-fifths of a 10 per cent tax, viz, all but 2 per cent, were expressly to be treated as levied by the 1917 Act which had been named in the Federal Control Act, and this five-

sixths and four-fifths, respectively, were thus brought within the provision requiring the carrier to pay the same out of its own funds, the 2 per cent being as theretofore paid or borne by the Director General out of the revenues received from operations.

The foregoing analysis of the situation seems to us to leave no doubt that the plain intention of Congress as expressed in all of the statutes dealing with the subject was to take from the carriers any liability for the 2 per cent income tax and to save them from any incidental disadvantage which might result if they were called upon to pay such amount. The United States at the time it took over the railroads had the one great concern to successfully carry on the war. All things were being unitedly devoted to that end. Both the collection of the revenues and the operation of the railroads were factors in that single project. We are not willing to believe, particularly in view of the several statutory expressions to the contrary, that either of these two extremely important matters was considered without full cognizance of its effect upon the other. The just compensation was fixed in the light of the tax laws then in existence, and the Revenue Act of 1918 was framed with full knowledge of the Federal Control Act and its effect upon the carriers' taxes. The Government was a party to an agreement with each of these carriers and this agreement was made so as satisfactorily to adjust the rights and obligations of these parties to each other. The purpose was to provide for the use by the Government of the railroad properties and to fix a fair consideration therefor. The consideration was determined not by disregarding the rights and obligations which the same parties sustained through their relation of sovereign and taxpayer, but by taking into account that relation and any other relations which would necessarily be affected.

The Government is an entity. To be sure, it has even in times of peace a multitude of various functions which in time of war are necessarily increased; but these functions, however separately carried on, do not render the United States divisible. What it does in one function can not be presumed, except when unmistakably expressed, to be undone in another function. And this is the effect of what the Commissioner now contends. He does not dispute the great purpose to provide just compensation to the carriers for the use of their properties, but he would take from the carriers as a tax a portion, small but no less substantial, of what Congress in the Control Act has said they shall have for their own. We can not attribute to Congress this inconsistency. We can not believe that by this indirect method Congress intended that the Commissioner might reduce such compensation as the language of the agreement seemed to assure. We think that the carriers were to be relieved of the 2 per cent tax or any part thereof, and that the assumption of this amount by the Director General was in effect a complete relinquishment by the United States of any right thereto which it may have had against the carrier. The liability therefor which the carrier would have had in the absence of Federal control was, to use a variety of expression meaning the same thing, transferred to the Director General, assumed by him, wiped out, or absorbed by the United States. See *Pittsburgh & West Virginia Ry. Co.* v. *United States*, 61 Ct. Cls. —, decided May 4, 1925.

It remains only to deal with some of the more specific contentions of the parties. The taxpayer relies, as conclusive authority for its position, upon *Duffy* v. *Pitney*, 2 Fed. (2d) 230, in which the Supreme Court denied certiorari on February 2, 1925. While that decision tends to support the taxpayer's view, the situation involves a substantially different statutory provision and distinctions which it is unnecessary here to consider. The principal distinction is that in the present case we are dealing not with a situation involving three parties, one of whom (the obligor) agrees to pay to another (the United States) a tax liability which, in the absence of statute and contract, would be attributable to a third (the obligee); but with a situation involving two parties—the Government and the taxpayer corporation. In view of the stress, however, which counsel for the taxpayer placed in brief and oral argument upon the authoritative effect of the Supreme Court's denial of certiorari, we are impelled to state that such denial can not be regarded as an affirmance or adoption of the opinion of the Circuit Court of Appeals. In addition to the Supreme's Court's opinion in *Hamilton Shoe Co.* v. *Wolf Bros.*, 240 U. S. 251, where it is unequivocally stated that "the refusal of an application for this extraordinary writ is in no case equivalent to an affirmance of the decree that is sought to be reviewed," we have the unmistakable inference to be drawn from the action of the Supreme Court in respect of the right of a lessee of a mine to deduct depletion under the Revenue Act of 1916. In *Weiss* v. *Mohawk Mining Co.*, 264 Fed. 502, the Circuit Court of Appeals of the Sixth Circuit denied on March 2, 1920, that the lessee had such a right. This view the court adhered to on petition for rehearing, June 15, 1920. The Supreme Court denied certiorari in 254 U. S. 637. If the present taxpayer were correct, this would mean that the Supreme Court had affirmed the decision below and thus established the uniformly proper construction of the statute. But the same question arose in the District Court of Minnesota and was decided contrariwise on March 30, 1922. *Alworth-Stephens Co.* v. *Lynch*, 278 Fed. 959. This was affirmed in an opinion by Judge Sanborn for the Circuit Court of Appeals, Eighth Circuit, in *Lynch* v *Alworth-Stephens Co.*, 294 Fed. 190. The Supreme Court granted certiorari to review the latter decision and, in an opinion by Mr. Justice Sutherland handed down March 2, 1925, *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364, this judgment was affirmed, thus setting at naught the construction of the statute announced in the *Mohawk Mining* case, in which certiorari had been refused.

The Commissioner urges that the 2 per cent tax is upon the railroad corporation by virtue of the provision in the 1918 Act that the 12 per cent and 10 per cent taxes, respectively, are imposed upon all corporations, and hence that the Director General's so-called payment of the amount is a payment made in behalf of the corporation, bringing it within such authority as *Houston Belt & Terminal Ry. Co.* v. *United States*, 250 Fed. 1; *Blalock* v. *Georgia Ry. & Electric Co.*, 246 Fed. 387; and *Rensselaer & Saratoga R. R. Co.* v. *Irwin*, 249 Fed. 726. But, as we have said in respect of the *Pitney* case, the present situation is distinguishable because of the unity of the United States acting by the Director General and the United States acting by the Commissioner of Internal Revenue. This was not a liability

of the carriers borne by the Director General, but to the contrary it was a release to the carriers of such liability.

The Commissioner urges that the Federal Control Act was an exercise of the power of eminent domain and may not be read as a taxing statute. We understand the contention to be in effect that the two statutes may not be read together to determine their effect upon the corporation's tax liability, but that the question must be determined entirely by reference to the Revenue Act of 1918 imposing an income tax upon all corporations. The Control Act originated in the Senate, and it is said that to give it consideration as a factor in determining tax liability would be of doubtful constitutionality, because it would in effect be treating as a valid statute an act which did not originate in the House, as provided by the Constitution, Art. I, Sec. 7, Cl. 1. That this argument is fallacious is apparent from the fact that the act nowhere purports to raise revenue, and its effect in the present instance is quite to the contrary. Its principal purpose is to provide for the operation of the railroads and for the just compensation of their owners, and it is one of the incidents of this purpose that revenues are affected. The Supreme Court in *Twin City Bank* v. *Nebeker*, 167 U. S. 196; and *Millard* v. *Roberts*, 202 U. S. 429, has made it clear that the bills for raising revenue covered by the constitutional provision do not include bills for other purposes which incidentally provide revenue. *A fortiori*, a bill which does not raise revenue even incidentally but operates to relinquish taxes otherwise collectible is not within the constitutional requirement.

The Commissioner looks only to the Revenue Act of 1918 and urges that to determine tax liability our attention must be confined to the revenue statutes. The Supreme Court, however, in *Evans* v. *Gore*, 253 U. S. 245, looked beyond the revenue act into a separate section of the Constitution to apply an exemption of judges' salaries contrary to the provision of the taxing statute. Consistently with this it is well known that the several Liberty Loan Acts relieved the interest from Liberty loans wholly or partially from income tax without any reference thereto being found in the contemporaneous revenue acts.

It is said that there was not a tax liability upon the Director General because it can not be supposed that the Government would tax itself; and from this the inference is drawn that the liability must be upon the corporation. This, however, as we have seen, assumes that a liability must exist somewhere, and if not upon the Director General, then upon the carrier. It may indeed be true that there is no liability upon the Director General, he being a Government agency, but it does not follow that a liability necessarily attaches to the corporation. The truth is that there is no liability of anyone for a *tax* since the Director General is not a Federal taxpayer and the corporation's tax liability has been absorbed in the provision for just compensation. The use, in the statute and the agreement, of the expression that the Director General should pay taxes or that the taxes should be paid out of railway operating revenue is merely a convenient method of expressing what we have already shown to be the purpose, and we are not inclined to defeat this purpose in order to ascribe to this language a technical and highly artificial significance.

It results from what has been said that the amounts of $14,500.22 for 1918 and $15,574.85 for 1919 were borne by the Director General as a direct charge against operating revenues and did not constitute a payment by him in behalf of the taxpayer of a tax liability imposed upon it. These amounts were not income of the corporation. To regard them as such, using the amount as the basis of additional tax, would necessarily operate to the detriment of the carrier, against which the United States, pursuant to the Federal Control Act, has expressly agreed to save the corporation harmless. It will not be assumed that Congress intended the circuity of action which would result by compelling the corporation to pay the tax attributable to the inclusion of these amounts in taxable net income and thus establish in the corporation a right of action against the United States to enforce the indemnity provision of the contract. No useful purpose has been suggested for such a wasteful proceeding, the result of which would have the effect of merely imposing upon the parties the expense involved in collection and perhaps litigation.