THE ANN ARBOR RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MANISTIQUE AND LAKE SUPERIOR RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 25869, 35337. Promulgated November 14, 1933.

*L. H. Strasser, Esq.*, for the petitioners.
*E. C. Algire, Esq.*, for the respondent.

332

336

OPINION.

STERNHAGEN : As shown in the preliminary statement, several of the assignments of error have been removed from controversy. The adjustment of these matters will be reflected in the final judgment. The matters at issue are considered in this opinion under Roman numerals which are correlated to the findings of fact.

I.

The issue covered by the second assignment is the propriety of including the so-called guaranty income received from the United

States by virtue of section 209 (c) of the Transportation Act, 1920, within petitioners' taxable income. In view of *Texas & Pacific Ry. Co.* v. *United States*, 286 U.S. 285, the petitioners now concede that the inclusion was proper, and the respondent's determination is therefore affirmed.

## II.

The petitioners urge that the aforesaid guaranty income paid by the United States pursuant to section 209 of the Transportation Act of 1920, is subject only to an 8 percent rate of tax and not the ordinary 10 percent rate. They argue that, since the income received during Federal control as just compensation was relieved from the normal tax of 2 percent, see *New York, Ontario & Western Ry. Co.*, 1 B.T.A. 1172, and the guaranty income was measured by the same standard, namely, the railway operating income of the test period, the guaranty income must be likewise relieved. Otherwise, it is said, the guaranty income will fall short of its purpose to give the carrier an equal measure of operating income with that of the pre-war period.

This view can not, we think, be sustained. The statute does not so provide expressly and there is no reason for its implication. The *Ontario & Western* case not only involved an entirely different question, whether the express release from the normal tax of 2 percent could itself be treated as taxable income, but was founded in a special provision of the Revenue Act of 1918, which has no force here. *Union Pacific R.R. Co.*, 26 B.T.A. 1126; *New York, Chicago & St. Louis R.R. Co.*, 26 B.T.A. 1229. Section 230 (b) was by its terms limited to the purposes of the Federal Control Act, which ended February 28, 1920, and the lower tax rate therein prescribed was clearly not, without more, to be applied to the income derived after that date. That this is true as to income actually earned from operations should be beyond doubt. So that a carrier, which by reason of its adequate earnings could not invoke the guaranty, could furthermore not claim an 8 percent tax rate. See *Texas & Pacific Ry. Co.* v. *United States*, 286 U.S. 285. A Congressional intent to give more than this to a carrier receiving its income through the guaranty we may suppose would be plainly stated and not left for a holdover construction of an obsolete provision covering Federal control.

## III.

Petitioners urge that the respondent has erroneously disallowed $598,171.26 of the deduction for maintenance of way and structures and of equipment during the period of the last ten months of 1920. This amount is part of the actual expenditures for the period which were accounted for as maintenance, but the disallowance is based

on the respondent's determination that to this extent the petitioners' ostensible maintenance cost was really not its own, but a burden assumed by the Director General, the liability for which accrued during the ten-month period. See *Continental Tie & Lumber Co.* v. *United States*, 286 U.S. 290.

Unlike *New York, Chicago & St. Louis R.R. Co.*, *supra*, there is no evidence here, outside the carriers' claim, that the Director General failed in his contractual duty to maintain the petitioners' properties adequately during Federal control. But the respondent has determined that they received, in their final settlements in 1921, allowances for undermaintenance of their properties during Federal control in the respective amounts of $574,191.51 and $23,979.75, a total of $598,171.26, and this is the amount by which the respondent has reduced the petitioners' deduction for maintenance expenses. As in *New York, Chicago & St. Louis R.R. Co.*, the question arises not because respondent calls the Director General's allowance income, but because he reduces the petitioners' deduction for maintenance expense by the amount of the Director General's allowance. Thus the issue, as to the measure of petitioners' actual and deductible maintenance expenses, is quite different from *Terminal R.R. Assn. of St. Louis* v. *Commissioner*, 61 Fed. (2d) 166; certiorari denied, 288 U.S. 604; 17 B.T.A. 1135; *Norfolk Southern R.R. Co.* v. *Commissioner*, 63 Fed. (2d) 304; 290 U.S. 672; 22 B.T.A. 302; and *Chicago & North Western Ry. Co.* v. *Commissioner*, 66 Fed. (2d) 61; 290 U.S. 672; 22 B.T.A. 1407. In those cases whether gross income was received as a matter of fact (*Terminal R.R. Assn. of St. Louis, supra*), or whether, being received in fact, the amount was gross income in law (*Norfolk Southern R.R. Co., supra*, and *Chicago & North Western Ry. Co., supra*), were questions which imposed a different and less burden on the petitioning taxpayer than the question of his right, despite the respondents determination, to deduct all amounts expended for maintenance without regard for the extent to which, as determined by respondent, such expenditures embodied an amount derived from the Director General in discharge of his contractual obligation.

The petitioners did not enter into the standard agreement provided for by section 1 of the Federal Control Act, but by acceptance of the benefits of section 2 thereof they brought themselves within the entire provisions of the act; consequently, their properties were taken over and used by the Director General subject to the same conditions as those contained in the standard agreement so far as they provided for the return of the properties to the carriers "in substantially as good repair and in substantially as complete equipment as it was in at the beginning of federal control." At the end of Federal control, the petitioners filed claims with the Director

General setting forth numerous items due from and to the Director General. The Ann Arbor's claim contained, among others, a claim for undermaintenance of way and structures of $507,968, and a claim for undermaintenance of equipment of $700 566.34, a total for undermaintenance of $1,208,534.34, and claimed a net balance due the corporation of $603,601.26. The Lake Superior's claim contained an item for undermaintenance of way and structures of $20,631.95, and claimed a net balance due the corporation of $69,079.98. In the final settlement agreements, the Ann Arbor acknowledged an indebtedness of $600,000 to the Director General, and the Director General acknowledged an indebtedness of $50,000 to the Lake Superior, and the account was closed by the Ann Arbor giving two notes, of a total face amount of $550,000, to the Director General.

The petitioners contend that nothing whatever was allowed by the Director General for undermaintenance. They say:

Instead of receiving any money as the result of the settlement, the petitioner paid a large sum to the Director General. An analysis of the claims presented and the settlement consummated leads irresistibly to the conclusion that nothing whatever was allowed on the claim for undermaintenance.

The Ann Arbor Railroad Company's claim (91, Respondent's Exhibit A) contains an item of $1,208,534.34 for undermaintenance. If this item had been allowed, the net amount due the Ann Arbor would have been $603,601.26. If the claim for undermaintenance be eliminated, the statement would show a balance of $604,933.08 due the Director General, and since the Ann Arbor paid the Director General $600,000 in the settlement, it is obvious that nothing whatever was allowed petitioner for undermaintenance on its claim.

The Manistique and Lake Superior Railroad Company's claim (93, Respondent's Exhibit B) contained an item of $20,631.95 for undermaintenance. If this claim had been allowed, petitioner would have been entitled to receive in settlement $69,079.98. If the claim for undermaintenance be eliminated, the statement would show a balance of $48,448.03 due the railroad company. It was actually allowed $50,000 by the Director General in the final settlement. The logical conclusion, therefore, is that the claims for undermaintenance in the case of both the Manistique and Lake Superior and the Ann Arbor Railroad Companies were wholly disallowed, and that neither company was allowed anything whatever for undermaintenance in the final settlement.

This assumes that all items in the claims, except the two undermaintenance items, were allowed by the Director General, and that the claims for undermaintenance were wholly eliminated. This assumption is not justified by the evidence.

The only witness on this matter was one of the Ann Arbor's representatives in the conferences with the Director General, which culminated in the final settlement agreement. He testified:

We went down; the representatives of the Ann Arbor Railroad went to Washington in, as I recall it, April, 1921; I know we left on Easter Sunday morning, and we had conferences with the representatives of the Director General, Mr. Tracy being the Comptroller of the Railroad Administration at that time and Mr. Alexander Smith, I believe, was their counsel, and we sat around the table for about a week, and there was a question of give and take all the way

through, there was Mr. Erb, our president, he was there and he made certain concessions to the counsel for the Director General, who, in turn, of course allowed similar concessions, and when the thing all wound up there was a lump sum 'settlement agreed upon.

Q. What was the—what credit was allowed the Ann Arbor in that settlement of the account?

A. I do not know; the balance was against the Ann Arbor to the extent of six hundred thousand dollars, when the final figures were computed and agreed to by the President of the Company and the Director General's representatives.

Q. Mr. Kiefaber, you testified this morning that the closing journal entry in both of these cases, or rather in the case of both petitioners recording the final settlement with the Director General was made in accordance with the I.C.C. regulations issued on January 25, 1922, which has been introduced here as Petitioner's Exhibit No. 4; I call your attention to paragraph 2 of that letter, or of that order which provides that items on which the amount of settlement may be mutually agreed upon between the Director General and the carrier, whether or not previously recorded in the account, shall be recorded in the accounts in accordance with the effective accounting regulations on the basis of settlement agreed upon. Now, as I understand it, you did not record these items which you had agreed upon in accordance with the I.C.C. regulations in effect at that time, but you carried the entire net credit to profit and loss. or the net debit, as the case may be, instead of allocating these items which had been agreed upon to the accounts where they belonged; is that a fact?

A. We could not identify the whole, because our inability to allocate the entire amount of six hundred thousand dollars charged by the Director General, prevented us from making a definite division of that figure, therefore all we could do was to wipe off the open accounts standing on the corporation's books, and then setting up this liability for the $600,000 and calling the rest profit and loss; we have no other way of determining what the amounts were other than what were on our books.

Q. In other words, you made no allocation of the net balance as between different items?

A. No, sir, we did not know what the $600,000 represented.

As to the Lake Superior's claim and the settlement agreed upon, the witness testified that according to notations which he made during the course of the conferences with the Director General, the items of $5,699.27 for interest on deferred compensation and $14,-505.50 for interest on open accounts due the corporation were entirely eliminated.

Q. Now the remaining item is maintenance of way and structures under $20,631.95; what is your recollection with respect to that?

A. Apparently from my recollection of the transaction and the notations which I have on my working copy, that amount evidently was practically allowed in full by the Director General, for this reason you will note that the total of the statement to which you refer is $69,079.98 due to the corporation, the items of interest or deferred compensation amounting to $5,699.27, and interest on open accounts due to corporation $14,505.50, or a total of $20,204.77, have been shown as having been deducted from the total of $69,079.98, leaving a balance of $48,875.21, due the corporation from the Director General, and in view of the fact that in setting this thing down and making final settlement

with the Director General, he allowed the M. & L. S. a flat figure of $50,000 and called it square, so that it would indicate that all other items had been allowed, there was only a difference of $1,200 between the amended claim and his round flat settlement figure of $50,000.

That is all the evidence to indicate whether the Director General made allowances for undermaintenance.

The petitioners, however, do not rest their case entirely upon the proposition that no allowances were made to them for undermaintenance, but urge that, even if the amounts in question be regarded as allowances for undermaintenance and within the field of the so-called reimbursement rule, still the respondent's action is erroneous, because "no part of the expenditures for maintenance in 1920 were made for the purpose of rehabilitating the property or making good deferred maintenance, but on the other hand the entire amount included as maintenance expenses covered only the usual, ordinary and necessary maintenance expenses in the operation of petitioner's property." Upon this proposition was predicated the introduction of elaborate statistical studies and opinion testimony to show that the petitioners' maintenance expenditures during the last ten months of 1920 were no more than can properly be attributed to the current maintenance requirements of that period.

The petitioners' first method of demonstrating that the maintenance charges of the last ten months of 1920 do not include restoration of the prior undermaintenance is an equated comparison with the cost figures of the test period. Applying this process, the Ann Arbor's actual average test period charges for maintenance become an equated figure of $1,480,721.90 in comparison with the 1920 figure of $1,600,814.19, and the Lake Superior's average test period charges become an equated figure, without adjustment for differences in the quantity of property used and in the extent of such use, of $94,473.81 in comparison with the 1920 figure of $73,633.35, which shows that the 1920 maintenance cost was $120,000 greater for the Ann Arbor, and $20,800 less for the Lake Superior, than the normal test period cost. The Ann Arbor's greater 1920 maintenance cost, as disclosed by the statistical study, is explained by the petitioners as due to unusual conditions in that year, such as numerous derailments and breakdown of equipment, caused by the bad condition and the lack of proper maintenance of the Ann Arbor's roadway, and to excessive running (minor) repairs to equipment, which were made necessary by the Ann Arbor's failure to provide the usual classified (major) repairs. To support this explanation, there was introduced the testimony of three witnesses and several other statistical studies.

Parvin, superintendent of the Ann Arbor, testified that he made weekly inspection trips over the road; that he kept himself inti-

mately acquainted with the condition of the road, from day to day and month to month; and when asked what the condition of the road was during the years 1920 and 1921, he replied as follows:

Putting it mildly, the condition was bad, basing that statement on the physical condition of the road from a standpoint of maintenance during the years 1920 and 1921, and on the further basis of our derailment record for those two years, notwithstanding every precaution that the Transportation Department could exercise over its men,—that is the department I had charge of, educating its men to operate as cautiously and as carefully as possible, and by placing slow orders to protect bad track, some of which if it is permissible, I will insert into the record, in the year 1920 we had 122 main line derailments on our 292 miles of railroad; 391 side track derailments. I think I should qualify that, though, by the statement that for the first three months in 1920, 16 of the main line derailments were occasioned by ice on the track,— we had a very severe ice storm in the first of 1920, which resulted in sixteen derailments on that account, but in 1921 we had no unusual conditions, we had 72 main line derailments, 289 side track derailments. Your Honor has been connected with the railroad, and for your information we had departmental jurisdiction—there is always considerable controversy between the departments when you have derailments, particularly when conditions were as I have stated.

By the MEMBER:

Q. Do you mean controversy as to which department is at fault?

A. Yes, sir; also the track will contribute to other causes, such as broken arch bars on cars; broken springs on locomotives, and in several instances the Grand Trunk Railroad complained of the condition of our track because they could not keep springs under our locomotives. Conditions got to the point where our vice-president and general manager at that time, Mr. Blomeyer, walked a lot of the track with me; we walked as much as seventeen miles a day; he finally remarked that from then on when I reported a derailment due to track conditions there would not be any further argument about it. That conditions did not only exist during 1920 and 1921, but right up until 1925, when the Wabash bought the property and started rehabilitating the property. As an offset, in 1930 we had 18 main line derailments, two chargeable to track. If it would be permissible, and to support my statement as to the conditions, I could put into the record for the month, say, of November, 1921 and November 1920, the slow orders over the track that were in effect at that time, but in view of these slow orders we still had those derailments, for instance in 1920, in November, we had twelve main line derailments, and in November 1921, we had ten derailments,—main line derailments, and we had a page full of slow orders at the time, as slow a speed over some of the track as five miles per hour.

Q. Do you, as an experienced railroad man, attribute any relation of cause and effect, between the number of derailments you had during 1920 and 1921, and the state of maintenance of the track?

A. Derailments certainly indicate poor maintenance, or lack of maintenance.

Q. Now, do you have any knowledge of the state of maintenance of the mechanical and car equipment of the Ann Arbor during this same period?

A. * * * I would not care to state as to the maintenance of equipment, but I can state as to the maintenance of the locomotives, which was poor and in direct line with the track maintenance.

Q. Can you state whether or not any rehabilitation of the Ann Arbor track or roadway was undertaken or conducted during either 1920 or 1921?

A. No rehabilitation was undertaken or conducted.

Q. Now, can you state whether or not any rehabilitation of locomotives, cars or other equipment was undertaken in either of these years, or conducted during those years?

A. In the case of locomotives there was not; in the case of cars, if you consider rebuilding some express cars, why I do not think I am prepared to say whether that would be or would not be.

He further testified that the track was very poorly maintained in 1920 and 1921; that such failure to maintain "naturally would cause considerable increase in your operating expenses"; that the derailments or wrecks to which he referred tended to increase expenditures in connection with track maintenance, equipment maintenance, operation of wrecking outfits, and claim payments; and that expenses of 1920 were materially increased, due to those wrecks and derailments. On cross-examination he testified, in part, as follows:

Q. Mr. Parvin, what do you understand by rehabilitation of properties?

A. Go ahead and putting your property in shape to do that for which the property was intended.

Q. That is to say, assuming in the beginning that it was grossly undermaintained.

A. Yes.

Butler, master mechanic of the Ann Arbor, testified that he inspected the power—locomotives, stationary boilers, pump stations and all of that sort of equipment—when he first became associated with the company in 1922; that he found all of such equipment to be in very bad condition; that the condition of the power was such as to lead him to believe that since 1920 it had not been kept in good condition or maintained in good repair up to the best standard of condition; and that he would even say that far less than the ordinary and necessary repairs had been made since March 1, 1920. After examining petitioners' Exhibit 43, being a statement of monthly expenditures for repairs to locomotives in an average ten months of the test period and in the last ten months of 1920, segregated as between classified (major) and running (minor) repairs, he testified that the exhibit indicated to him that the power was not in proper condition either in the test period or in the last ten months of 1920; that in order to keep locomotives in proper condition, classified and running repairs should be made thereto on a fifty-fifty basis; that unless approximately the same amount of money is spent for classified repairs as for running repairs, the power is not in proper condition and you are spending too much money on running repairs trying to operate the railroad; and that, judging from the condition of the equipment in 1922, it is his opinion that the locomotives had not been put in proper condition or rehabilitated in 1920. He testified:

Q. Do you mean anything more than this: that when you saw them in 1922 they were in bad condition and if they had been properly maintained before 1922 they probably would not have been in such bad condition?

A. No, sir.

Q. And from that you concluded that at some time before 1922 they were permitted to get in bad condition?

A. That is right.

Q. And you do not know at what time before 1922 they were permitted to get in bad condition, do you?

A. No, I do not.

Q. You just know they did not have as much maintenance as they should have had in the period prior to 1922?

A. I know they had not been properly maintained.

Q. At any time prior to 1922?

A. Prior to 1922.

Q. You do not have any information of any period prior to 1922, do you? They might have been in bad condition in 1916 or in 1918 or in 1920, and all of those things would result in the bad condition in which you found them in 1922?

A. That is right; what I mean is if you had a bunch of fifty engines in good condition that it would take more than two years to put them in the condition that I found them in.

Q. So you do not know, as a matter of fact, what was done to them in 1920?

A. No, sir, I was not there.

Exhibit 21, containing data taken from the annual reports of the chief inspector of locomotive boilers to the Interstate Commerce Commission, shows, in respect of the Ann Arbor's locomotives, as follows:

|  | Number owned | Number inspected | Number defective | Percentage of inspected found defective | Ordered out of service |
|---|---|---|---|---|---|
| Test period: | | | | | |
| Average | 44 | 40 | 16 | 40 | 3 |
| Federal control period: | | | | | |
| 1918 | 45 | 23 | 8 | 35 | 0 |
| 1919 | 47 | 34 | 26 | 76 | 5 |
| 1920 | 51 | 31 | 23 | 74 | 5 |

Exhibit 43, previously referred to in connection with Butler's testimony, shows repairs applied to Ann Arbor's locomotives, as follows:

|  | Repairs | | | | |
|---|---|---|---|---|---|
|  | Classified | Percent | Running | Percent | Total |
| Average for ten months of test period | $38,100.32 | 33.70 | $74,965.72 | 66.30 | $113,066.04 |
| Average for ten months of test period—equated | 97,998.15 | 33.70 | 192,820.04 | 66.30 | 290,818.19 |
| Last ten months of 1920 | 124,275.51 | 36.01 | 220,847.06 | 63.99 | 345,122.57 |

Treacy, car foreman of the Ann Arbor since 1918, testified that he has been at car work since 1896, and that he supervises all of the Ann Arbor's car work; that the condition of the Ann Arbor's car equipment was " quite bad " from March 1, 1920, to the end of 1921; that the ordinary and necessary repairs were not made to the Ann Arbor's car equipment in 1920; that it was the practice in 1920 to make only necessary repairs to good cars; that during and after Federal control the cars were operated " all over the country, and when they came back to us, they were in bad condition "; that " we picked out the lightest cars [cars needing the least repairs] that we could get and made repairs and let the other ones stand "; that " we did not work full force or full time in 1920, because we did not have the money to do it with "; and that the bad order cars " coming in on the line " for repairs in 1920 were heavier than usual.

Exhibits 44, 46, and 47 show that the number of Ann Arbor freight cars in bad order in March 1920 was 191, which is 9.10 percent of the number of cars owned and leased in that month; and that the number of freight cars in bad order in December 1920 was 293, which is 13.88 percent of the number of cars owned and leased in that month.

Exhibits 45, 46, and 47 show that the average number of Ann Arbor freight cars repaired during each month of the test period was 620, which is 26.90 percent of the average number of cars owned and leased in that period; and that the average number of cars repaired during each of the last 10 months of 1920 was 358, which is 16.89 percent of the average number owned and leased during those months.

The petitioners contend that this oral and documentary evidence " discloses facts which rationally account for the excess expenditure [greater maintenance cost of the 1920 period] indicated by the result of the study [comparison of 1920 period maintenance cost with test period maintenance cost], and supports our contention that no rehabilitation of the Ann Arbor property occurred during 1920."

From the foregoing, it will be observed that the petitioners' position is that maintenance expenditures of the 1920 period in an amount equal to the equated expenditures of the test period are to be regarded as having been made for current maintenance and as necessarily excluding prior undermaintenance; that the statistical study of comparative maintenance costs of the 1920 and test periods discloses that all but approximately $120,000 of the Ann Arbor's 1920 maintenance expenditures was for current maintenance, and that all of the Lake Superior's 1920 maintenance expenditures was for current maintenance; that the greater 1920 maintenance cost in the case of the Ann Arbor is rationally accounted for by the facts disclosed by the oral

and documentary evidence; hence, there was no restoration of prior undermaintenance in 1920.

This is the identical proposition which was presented in *New York, Chicago & St. Louis R.R. Co.*, *supra*, and *Southern Ry. Co.*, 27 B.T.A. 673. It was fully and carefully considered and rejected in those opinions, the decision in *Missouri Pacific R.R. Co.*, 22 B.T.A. 267, to the contrary, being *pro tanto* expressly overruled.

Since the statistical study, or comparison of 1920 maintenance cost with test period maintenance cost, is the only evidence we have, in the case of the Lake Superior, bearing upon the question of whether Federal control undermaintenance was made good by that company in the 1920 period, it follows, in line with the decision in the *Southern Ry.* case, that the respondent's determination, so far as it affects that company, must be sustained. As to the Ann Arbor, it remains to be determined whether the evidence, other than the statistical study of comparative maintenance costs of the 1920 and test periods, justifies overturning the respondent's determination as to it.

It is clear from the evidence that the Ann Arbor's roadway, locomotives, and freight train cars were not in good repair in 1920. As to structures, miscellaneous facilities, passenger train cars, floating equipment, and miscellaneous equipment, for the maintenance of which the Ann Arbor expended $403,115.56 in the last ten months of 1920, there is no evidence as to their condition or state of maintenance in the 1920 period, or as to any other facts pertaining to them; and, consequently, there is no proof that the expenditure of $403,115.56 for the maintenance of these facilities in the 1920 period contains nothing for restoration of prior undermaintenance. The fact that the Ann Arbor's roadway, locomotives, and freight train cars were not in good repair in 1920 does not prove that the 1920 expenditures included nothing for restoration of prior undermaintenance. The question can not be decided by reference to the condition of the facilities in 1920; for, if no more than a single item of maintenance had been performed in the 1920 period—in which event, the condition of repair might obviously be very bad—the question would still remain as to whether the particular item of maintenance performed was one which the Director General had undertaken. The proposition was considered in *New York, Chicago & St. Louis R.R. Co.*, *supra*, and rejected in the following language:

The petitioner's assistant chief engineer stated that he had inspected the railroad according to his periodic wont and found it to be in his opinion in no better condition at the end of 1920 than at the beginning. This opinion adds little or no force to the petitioner's contention, for, aside from the fact that this is an opinion of an interested person regarded by the Director General as inadequate for official recognition (Director General's Report to the President,

*supra*, p. 17), and not controlling with this Board (*Uncasville Mfg. Co.* v *Commissioner*, 55 Fed. (2d) 893), the physical appearance of the road in general is not shown to disclose whether $459,000 of the year's maintenance expense had been devoted to such restoration of road as the Director General had failed in his contractual duty to maintain.

Likewise, in *Southern Ry. Co., supra.*, it was said:

The fact that there was no improvement in the average condition of maintenance by the expenditures of the 1920 period is of no importance; that, like the accounting test, indicates only that not more than the usual and normal amount of maintenance was accomplished in the period, or that such maintenance as was performed was not greater than current necessity required. The real question here is, Was the maintenance performed in the 1920 period, or some portion thereof, that which actually belonged to the Federal control period for which the petitioner was reimbursed by the Director General?; and that cannot be answered by a mere comparison of maintenance conditions at the beginning of the period with the conditions existing at the end of the period, as was held in the *Missouri Pacific* case, but requires an examination of particular items of maintenance performed. * * *

Parvin's statement that there was no rehabilitation of the Ann Arbor's roadway and locomotives in 1920, and similar statements by Butler in respect of locomotives and Treacy in respect of freight train cars, are inconsistent with other evidence. Exhibit 33 shows the application of labor and materials to roadway in the 1920 period in greater quantities than in the test period; and Parvin testified that these were applied at points where most needed. Butler did not become associated with the Ann Arbor until 1922; and, consequently, he had no knowledge of what had been done in 1920 in respect to locomotives. His statement was based entirely upon what he saw in 1922 and his judgment that the locomotives could not have reached the condition in which he found them in 1922 had they been kept in a state of good repair after March 1, 1920. Exhibit D, however, being a photostatic copy of the supplemental claim which the Ann Arbor filed with the Director General, received in evidence without objection by petitioners' counsel, shows that of the number of locomotives turned back by the Director General at the end of Federal control in bad condition, 10 were fully repaired and 22 partially repaired between March 1 and December 31, 1920, at a cost of $157,-416.32. And, as to freight train cars, Exhibit E, a photostatic copy of a further supplemental claim which the Ann Arbor filed with the Director General, also received in evidence without objection by petitioners' counsel, shows that 799 "heavy bad order cars" were "returned to our line for rebuilding during the period January 1, 1920, to January 31, 1921," and that the cost of "actual rebuilding" of 675 of said cars amounted to $351,836.58.

The respondent's determination that petitioners' maintenance deductions must be cut down so as to exclude the Director General's

undermaintenance allowance is sustained, the disallowance of the Lake Superior being apparently properly admitted by respondent to amount of $20,631.95, instead of $23,979.75 originally disallowed.

## IV.

The parties have stipulated that on May 1, 1919, the petitioner issued its two-year 6 percent notes, of the face value of $750,000, maturing May 1, 1921, for $720,077.92 cash; that in 1920, the petitioner purchased and retired $27,200 face value of such notes, paying therefor $25,024; that the issuing price of the notes retired in 1920 was $26,114.83; that the discount allocable to the notes retired in 1920 previously amortized is $361.72; and that if, as a matter of law, the difference between the purchase price and the sale price of the notes retired in 1920 is taxable income, the amount to be included in respect of the transaction is $1,452.55. On the brief, the petitioners concede that the amount of $1,452.55 is taxable income. *United States* v. *Kirby Lumber Co.*, 284 U.S. 1. Since the amount included in income by the respondent is $2,176, net income shown in the deficiency notice should be reduced by $723.45.

## V.

The proposed findings in this subdivision relate to the eighth and ninth assignments of error, which are considered together. In the eighth assignment the Ann Arbor contends that the deduction for operating expenses allowed by the respondent is understated by reason of an offset of $31,000, representing the proceeds from the sale of the spur track to the Owosso Sugar Co.; and in the ninth assignment it is charged that the Ann Arbor sustained a loss of $37,007.36 upon the sale of the spur track, which loss the respondent has not allowed as a deduction.

The property in question was acquired prior to March 1, 1913. Under the applicable statute, the Revenue Act of 1918, the basis for determining any gain from the sale is cost or March 1, 1913, value, whichever is higher, and the basis for determining any loss is cost or March 1, 1913, value, whichever is lower. *United States* v. *Flannery*, 268 U.S. 98. On the brief, the petitioners contend that the cost of the track was $69,774.17; that the fair market value at March 1, 1913, was $68,494.43; and, using the alleged March 1, 1913, value as the basis, that the Ann Arbor sustained a deductible loss of $37,494.43.

The alleged cost of $69,774.17 represents the $28,131.73 expended by the Ann Arbor plus the $41,642.44 alleged to have been expended by the New Haven Co. Clearly no amount expended by the New Haven Co. can be included in the Ann Arbor's cost basis, and this is not argued. The evidence shows that no cash refunds were ever

paid by the Ann Arbor to the New Haven Co. under paragraph 7 of the agreement. The findings show that the New Haven Co. had rendered statements of amounts due it under paragraph 7, in the total sum of $2,300 or $2,400, and the Ann Arbor's auditor testified that " I can recall there was one bill made against them [the New Haven Coal Mining Co.] for around $5,400 for a bridge, and my best recollection is that these refunds that were due them [the New Haven Coal Mining Co.] was [sic] credited to that bill as part of the track." Evidently, then, the Ann Arbor had not been reimbursed for the cost of the bridge at the time the New Haven Co. discontinued operations and went out of business. The evidence does not prove a greater cost than $28,131.73; and, since the track and bridge were disposed of for $31,000, no loss resulted to the Ann Arbor from the transaction; and none is deductible.

As to the eighth assignment, we are of opinion that the basis to be used is the original cost to the Ann Arbor of $28,131.73 and that the profit of $2,868.27 is properly within its income. This transaction has nothing to do with the deduction for expenses.

We are not persuaded that the theoretical construction of a figure to represent the fair market value of the property on March 1, 1913, is demonstrative of the value in fact or that the evidence establishes a value on March 1, 1913, in excess of the cost of $28,131.73. We also find no sufficient evidence to support a finding that 1,132 feet of the track were omitted from the sale.

The respondent's determination in respect of the sale of the spur track is modified, by reducing the determined net income by $28,131.73.

### VI.

The net income for January and February 1920, taxable at the rate of 8 percent, and the net income for the period March 1 to December 31, 1920, taxable at the rate of 10 percent, will be determined in accordance with the findings.

*Judgment will be entered under Rule 50.*